IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JOHN UTTERBACK, | CASE NO. 5:25-CV-02324-DAR |
| Plaintiff, | JUDGE DAVID A. RUIZ |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

## INTRODUCTION

Plaintiff John Utterback challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter was referred to me under Local Civil Rule 72.2 to prepare a Report and Recommendation. (Non-document entry of Oct. 28, 2025). For the reasons below, I recommend the District Court **AFFIRM** the Commissioner's decision.

## PROCEDURAL BACKGROUND

On March 22, 2021, Mr. Utterback applied for DIB, alleging disability as of January 1, 2021 due to low vision. (Tr. 166, 62). After his claim was denied initially and on reconsideration, Mr. Utterback requested a hearing before an administrative law judge. (Tr. 61, 74, 88-89). On August 12, 2022, Mr. Utterback (represented by counsel) and a vocational expert (VE) testified before the ALJ. (Tr. 30-60). On October 17, 2022, the ALJ determined Mr. Utterback was not disabled. (Tr. 14-29). On November 6, 2023, the Appeals Council denied Mr. Utterback's request for review of the decision, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; *see also* 20 C.F.R. § 404.981). Following appeal of that decision, Mr. Utterback and the

Commissioner stipulated to remand the matter to the Commissioner for further consideration of his claim. (Tr. 414).

On remand, the ALJ held a hearing on October 23, 2024, during which Mr. Utterback and a VE testified. (Tr. 383-413). On January 1, 2025, the ALJ again determined Mr. Utterback was not disabled. (Tr. 363-82). The Appeals Council declined Mr. Utterback's exceptions to the ALJ's decision, making the hearing decision the final decision of the Commissioner. (Tr. 354-56; *see also* 20 C.F.R. § 404.984(b)(2)). Mr. Utterback timely filed this action. (ECF #1).

## FACTUAL BACKGROUND

### I. Personal and Vocational Evidence

Mr. Utterback was 59 years old at his alleged onset of disability and 63 years old at the most recent hearing. (*See* Tr. 62). He graduated from high school and took additional classes relevant to his prior work. (Tr. 392). Mr. Utterback previously worked as a wireless communications network engineer and, most recently, as a handyman. (Tr. 389-90).

### II. Relevant Medical Evidence[1]

#### A. Back and Neck Pain

In September 2018, Mr. Utterback sought treatment for a sudden onset of neck and left shoulder pain while turning his head. (Tr. 262). The examining physician noted limited rotation to the left and assessed torticollis. (Tr. 264). Mr. Utterback was prescribed a "muscle/ nerve relaxer" and a non-steroidal anti-inflammatory drug (NSAID) and directed to follow up for further

[1] Mr. Utterback challenges the ALJ's evaluation of his spinal pain and low vision. (ECF #9 at PageID 706). Accordingly, I limit my discussion to those conditions.

treatment, if needed. (*Id.*). The record does not show Mr. Utterback returned for further treatment of the issue.

Three years later, in January 2021, Mr. Utterback returned to the doctor's office but did not report any back or neck pain. (Tr. 270-72). In August 2022, Mr. Utterback met with the doctor "for a physical to obtain disability benefits." (Tr. 265). The treatment record does not document any neck or back examination findings, but the physician noted the following:

> Regarding his neck and back concerns, he did have plain films of his neck about 7 years ago demonstrating some mild arthritis changes. He reports symptoms include pain in both areas, especially with increased physical activity. His report of symptoms included periodic sessions cutting firewood. He states he can do so for several hours as long as he limits the size of the piece of wood he is handling, but subsequent to these sessions, he requires a few days to recover.
>
> Mr. Utterback was advised that I have nothing I could label as a disabling condition based on today's evaluation and his documented past history . . . .

(Tr. 268).

Mr. Utterback did not seek further medical treatment until February 2024 when he transitioned to a new primary care physician. (Tr. 637). He did not report neck or back pain or stiffness at the time. (Tr. 637-38). On December 2, 2024, during a consultative examination, Mr. Utterback reported a 20-year history of back pain aggravated by standing, lifting, and coughing, and a 20-year history of neck pain that "comes and goes weekly," causes numbness and tingling in his hands and fingers, and is aggravated by turning his head too quickly. (Tr. 649). The consulting physician documented normal gait, muscular tenderness near the lumbar spine, normal muscle strength, some diminished range of motion in the shoulders and cervical and lumbar spine, and normal seated and supine straight-leg-raise tests. (Tr. 651-55). The physician also noted Mr. Utterback appeared comfortable in supine and seated positions. (Tr. 651).

### B. Low Vision

Mr. Utterback reportedly has a life-long history of strabismic amblyopia in the right eye and myopic degeneration in both eyes.[2] (Tr. 640). In March 2021, at the Wooster Eye Center, Mr. Utterback reported struggling with "close work" for 18 months, including using a computer. (Tr. 254). After an eye examination, Jeffrey Perkins, M.D., documented Mr. Utterback's best-corrected visual acuity scores as 20/200 in the right eye and 20/40 in the left eye. (Tr. 255). He assessed strabismic amblyopia in the right eye and age-related nuclear cataracts, posterior vitreous detachment (PVD), and degenerative myopia in both eyes. (Tr. 256).

Mr. Utterback returned to Dr. Perkins in October 2021 and reported worse vision and trouble with driving, reading books and newspapers, watching television, and using a computer. (Tr. 247; *see also* Tr. 251). Notably, Mr. Utterback needed help to fill out paperwork at the Eye Center due to his low vision. (*Id.*). His best-corrected visual acuity was stable in the left eye at 20/40, but "CF" in the right eye.[3] (Tr. 252). Dr. Perkins assessed the same findings plus monocular esotropia in the right eye and noted that poor vision in the right eye was due to

---

[2] Strabismic amblyopia, or amblyopia caused by strabismus, is an eye disorder where the two eyes do not line up in the same direction and one eye is "lazy" and does not work properly with the brain, causing the brain to favor the other eye. *Amblyopia, MedlinePlus,* http://medlineplus.gov/amblyopia.html (last accessed Sept. 18, 2026).

[3] The regulations explain that CF means "counts fingers." Visual acuity recorded as CF means that no optical correction will improve visual acuity. The regulations provide that if central visual acuity is recorded as CF, an adjudicator will determine the claimant's best-corrected central visual acuity is 20/200 or less in that eye. 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 2.00A(5)(a)(ii).

amblyopia and vision in the left eye is worsening due to a cataract.[4] (Tr. 253). Mr. Utterback did not seek further treatment for low vision.

In November 2024, during an ophthalmological consultative examination, Mr. Utterback reported blurry vision and difficulty with depth perception, focusing, reading, and watching television. (Tr. 640). His best-corrected visual acuity remained stable in the right eye at CF, but 20/50 in the left eye. (*Id.*). His best-correct visual acuity scores for reading came to CF at the right eye and 20/200 in the left eye. (*Id.*). Consultative examiner Joseph Thomas, M.D., diagnosed degenerative myopia with maculopathy in the right eye, degenerative myopia in the left eye, and age-related nuclear cataract, vitreous degeneration, myopia, regular astigmatism, and presbyopia in both eyes. (Tr. 642). Dr. Thomas noted Mr. Utterback's cataracts were not visually significant at that time. (*Id.*).

## III. Medical Opinions and Prior Administrative Medical Findings

In 2021, a state agency medical consultant reviewed the available records and determined that, due to his vision impairment, Mr. Utterback can lift and carry twenty pounds frequently and fifty pounds occasionally, stand/walk and sit for a total of about six hours each in an eight-hour workday, must avoid all exposure to hazards, and has near acuity, depth perception, accommodation, and field of vision limitations in the right eye. (Tr. 63-65). Another state agency medical consultant reconsidered Mr. Utterback's claim, including updated medical records, and adopted the same limitations but added that Mr. Utterback "should not be expected to read fine

---

[4] Monocular esotropia is a form of strabismus in which one eye turns inward towards the nose. *Esotropia, Cleveland Clinic,* http://my.clevelandclinic.org/health/diseases/23145-esotropia (last accessed Sept. 18, 2026).

print" and must "avoid all exposure to unprotected heights, hazardous machinery, and commercial driving." (Tr. 71).

Discussed above, Mr. Utterback underwent a consultative physical examination. (Tr. 649-67). A cervical x-ray obtained during the examination showed moderate degenerative changes, most significant at the C5-C6 level with a loss of disc height and endplate spondylosis. (Tr. 667). After interviewing and examining Mr. Utterback, the doctor opined he can lift and carry up to twenty pounds occasionally and ten pounds frequently; sit for one hour at a time and five hours total in a workday; stand for twenty minutes at a time and two hours total; walk for twenty minutes at a time and one hour total; occasionally reach, handle, finger, feel, push/pull, and operate foot controls; occasionally climb ramps and stairs; be exposed to moderate noise; and occasionally be exposed to temperature extremes and vibrations. (Tr. 658-62). He determined Mr. Utterback can never climb ladders, ropes, or scaffolds and never balance, kneel, stoop, crouch, or crawl and must avoid all exposure to hazards (unprotected heights, moving mechanical machinery, operating a motor vehicle, humidity, and wetness). (Tr. 661-62). The consultative examiner also checked boxes indicating Mr. Utterback cannot read very small print, newspaper print, or book print; cannot view a computer screen; and cannot differentiate the shape and color of small objects. (Tr. 661).

Also discussed above, Dr. Thomas conducted a vision-related consultative examination and diagnosed Mr. Utterback with several impairments. (Tr. 642). Explaining how these impairments affect Mr. Utterback's ability to perform work-related activities like driving, reading, working at heights, and in hazardous situations, Dr. Thomas stated the following:

> He has degenerative myopia with poor vision [in the right eye] and decreased vision [in the left eye]. He no longer drives and no longer works his prior job. He states he almost hit a pedestrian a few years ago and that is what made him stop driving. He

> can read but should not work at heights or under hazardous conditions. He does not have visually significant cataracts at this time.

(*Id.*).

**IV. Administrative Hearing**

At the hearing, Mr. Utterback testified he stopped working and driving because of his vision. (Tr. 389). His eye impairments have caused his vision to worsen, with intermittent blurriness and objects floating in front of his eyes. (Tr. 395). He has one good eye, restricting depth perception. (Tr. 405). He can read print if he holds it three inches from his face. (Tr. 396). Mr. Utterback has issues with his lower back muscles, sciatic nerve, and neck that make it difficult to stand for long periods or stand up from a seated position when his back muscles are spasming. (Tr. 397). He estimates he can lift no more than twenty pounds. (Tr. 396).

The VE classified Mr. Utterback's prior work as a microcomputer support specialist and in maintenance repair. (Tr. 407). The VE then testified an individual limited to medium-exertion work and subject to the restrictions listed in the ALJ's decision (*see* Tr. 370) could not perform his past relevant work but could work as a linen room attendant, dining room attendant, and box bender. (Tr. 408-09).

## Standard for Disability

Eligibility for benefits turns on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 1382c(a)(3)(A); *see also* 20 C.F.R. § 404.1505(a).

The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine whether a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, which is "severe," defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his or her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to prove whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine whether the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is the claimant deemed disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

**THE ALJ'S DECISION**

At Step One, the ALJ determined Mr. Utterback had not worked since January 1, 2021, the alleged onset date. (Tr. 369). At Step Two, the ALJ identified the following severe impairments: cataract/strabismus amblyopia right eye/degenerative myopia/monocular esotropia right eye (collectively, the "visual impairment"), coronary artery disease, and chronic obstructive

pulmonary disease. (*Id.*). At Step Three, the ALJ found Mr. Utterback's impairments did not meet or medically equal the requirements of a listed impairment. (*Id.*).

At Step Four, the ALJ determined Mr. Utterback's RFC as follows:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except the claimant must avoid concentrated exposure to humidity, extreme of heat and cold, pulmonary irritants such as fumes, odors, gases, dust, and poor ventilation and must avoid all exposure to unprotected heights, moving machinery, and commercial driving; the claimant may occasionally perform tasks requiring near and far acuity, is able to read fourteen point type or larger, and may occasionally perform tasks requiring precise depth perception [such as threading a needle]; the claimant can perform tasks that do not require peripheral vision on the right side.

(Tr. 370). The ALJ concluded Mr. Utterback did not have past relevant work. (Tr. 374). At Step Five, the ALJ determined Mr. Utterback could perform other work in the national economy, including as a linen room attendant, dining room attendant, and box bender. (Tr. 375). Thus, the ALJ concluded Mr. Utterback was not disabled. (Tr. 376).

## Standard of Review

In reviewing the denial of Social Security benefits, the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters,* 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). But "a substantiality of evidence evaluation does not permit a selective

reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Apart from considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. *Walters,* 127 F.3d at 528. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not follow its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000,

2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

## Discussion

Mr. Utterback claims the ALJ erred in two ways. First, he contends the ALJ erred in concluding his cervical degeneration was not a severe impairment and in not assessing corresponding limitations in the RFC. (ECF #9 at PageID 705). Second, he argues the ALJ did not resolve an ambiguity in the ophthalmological consultative examination report and substituted his own medical judgment about his limitations. (*Id.*).

### I. Evaluation of Mr. Utterback's Lower Back Condition at Step Two

At Step Two, the ALJ considers the claimant's medical impairments and decides if they are severe and meet the duration requirement. 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant's impairments are not severe or do not meet the duration requirement, the claimant is not disabled. *Id.* If the claimant does have a severe impairment that meets the duration requirement, the ALJ moves to Step Three and considers whether the impairment or combination of impairments meets or medically equals a listed impairment. *Id.* § 404.1520(a)(4)(iii). If the claimant is not considered disabled at Step Three, the ALJ assess the claimant's RFC to determine if the claimant can perform the claimant's past relevant work or other work that exists in the national economy. *Id.* § 404.1520(a)(4)(iv), (v). In assessing the RFC, the ALJ must consider all the claimant's medically determinable impairments, including those impairments deemed "not severe" at Step Two. *Id.* § 404.1545(a)(2).

The Sixth Circuit has long construed Step Two as a *de minimis* hurdle in the sequential evaluation. *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). Under that prevailing view, "an

impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Id.* (citing *Farris v. Sec'y of Health & Hum. Servs.,* 773 F.2d 85, 89-90 (6th Cir. 1985)). The severity requirement is primarily used to screen out claims that are "totally groundless." *Farris,* 773 F.2d at 89. When the ALJ determines that one or more impairments are severe, the ALJ "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *5 (July 2, 1996). When the ALJ considers all of a claimant's severe and non-severe impairments in the remaining steps of the disability determination, an ALJ's failure to find additional severe impairments "[does] not constitute reversible error." *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987). In *Maziarz,* the agency determined the claimant suffered from several severe impairments, but his cervical condition was not severe. *Id.* The agency continued with the remaining steps in the sequential evaluation process and because the agency "properly could consider claimant's cervical condition in determining whether claimant retained sufficient residual functional capacity to allow him to perform substantial gainful activity," the court held that any error at Step Two was harmless and it was therefore "unnecessary to decide" whether the agency erred in failing to find that the claimant's cervical condition constituted a severe impairment. *Id.*

The same conclusion applies here. At Step Two the ALJ determined torticollis/cervical degenerative disc disease and hypertension were not severe impairments, stating:

> A combination of factors, including spontaneous resolution of the condition or resolution by a course of medications, duration of less than the requisite twelve months, failure of object testing to sustain a diagnosis, scarcity of treatment or a sporadic work history, indicate that the existence of these conditions will not cause more than minimal limitations on the claimant's ability to engage in basic work activity and are therefore nonsevere. For example, and notwithstanding radiographic

> evidence of moderate cervical degenerative disc disease, the claimant has not and discernibly has not made use of prescription therapies addressed to this condition. In the last primary care visit prior to his post-hearing consultative examination, he reported no history of symptoms, denied cervical stiffness, numbness, or weakness.
>
> I considered all of the claimant's medically determinable impairments, including those that are not severe, when assessing the claimant's residual functional capacity, as is evidence, in part, from the restriction to medium exertion.

(Tr. 369). Later, in evaluating the consultative physical examiner's medical opinion, the ALJ noted the opinion "overstate[d] most of the claimant's limitations, by comparison to the evidence of record," and concluded "[t]o the extent his limitations are based on cervical or lumbar pain, these limitations are impermissibly based on symptoms." (Tr. 374).

Because the ALJ considered Mr. Utterback's cervical impairment when determining his RFC, it is "unnecessary to decide" whether the ALJ erred in classifying his cervical impairment as non-severe at Step Two. *Maziarz,* 837 F.2d at 244. For that reason, I decline to recommend the District Court remand on this basis.

## II. Evaluation of the Ophthalmological Consultative Examination Report at Step Four

Mr. Utterback's second challenge is to the ALJ's evaluation of Dr. Thomas's vision-related medical opinion. Discussed above, Dr. Thomas documented Mr. Utterback's best-corrected visual acuity as "CF" in the right eye and 20/50 in the left eye and best-corrected near acuity for reading as "CF" in the right eye and 20/200 in the left eye and concluded "[h]e can read but should not work at heights or under hazardous conditions. He does not have visually significant cataracts at this time." (Tr. 640, 642). The examination form required the examiner to verify whether "visual acuity as given" was consistent with the examination findings and, if not consistent, to explain

why. (*Id.*). Here, the doctor's checkmark does not answer the question, but the doctor did not explain how any findings were inconsistent, suggesting no inconsistency:

> **Visual acuity as given IS ___x__IS NOT consistent with findings. If not consistent with findings, please explain.**

In his review of the evidence, the ALJ noted the difference in visual acuity (20/50) and reading acuity (20/200) in the left eye and, referring to the consistency of visual acuity with the findings, explained "[i]t is not clear whether the examiner meant to indicate that this examination was reliable or unreliable; however, I consider the ambiguity resolved by the definitive statement in the opinion that the claimant can read." (Tr. 371).

According to Mr. Utterback, the ALJ committed reversible error because he did not resolve the ambiguity by "seek[ing] clarification of the consultative examiner's opinion" but rather substituted his own medical judgment. (ECF #9 at PageID 716). In support, he notes Dr. Thomas opined without elaboration that he could read and argues the ALJ inappropriately inferred too much about his remaining visual abilities from the statement alone. (*Id.* at PageID 717). He elaborated on this argument in his reply brief, claiming the ALJ's assessment of visual limitations in font size, near acuity, depth perception, and peripheral vision are speculative, inferring the ALJ arrived at those limitations by substituting his own judgment for that of a medical professional. (ECF #11 at PageID 731). Consequently, he argues, the visual limitations in the RFC are suspended over nothing more than the ALJ's interpretation of the medical data. (*Id.*). The Commissioner acknowledges the notation in Dr. Thomas's report is unclear but contends it is inconsequential because the ALJ accounted for the opined limitations in the RFC and the ALJ's duty to recontact a medical source is discretionary. (ECF #10 at PageID 726).

To begin, the RFC is "the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *2. The ALJ is solely responsible for assessing an individual's RFC and must base that assessment on all relevant evidence in the case record, including information about the individual's symptoms and any medical source statements from acceptable medical sources. *Id.*; *see also Coldiron v. Comm'r of Soc Sec.*, 391 F.App'x 435, 439 (6th Cir. 2010) ("The Social Security Act instructs that the ALJ—not a physician—ultimately determines a claimant's RFC."). In assessing the RFC, the ALJ "must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." SSR 96-8p, 1996 WL 374184, at *7. Thus, when the ALJ finds ambiguity in a consultative examiner's report, the ALJ need not necessarily recontact the consultative examiner for clarification. Indeed, the regulations provide that the ALJ "will contact the medical source who performed the consultative examination" only "if the report is inadequate or incomplete." 20 C.F.R. § 404.1519p(b).

Mr. Utterback does not argue the consultative examiner's report was inadequate or incomplete. Instead, he focuses on the ALJ's resolution of the purported ambiguity between distance and near vision acuity, arguing that the ALJ relied on Dr. Thomas's opinion that "he can read" but Dr. Thomas "provided no specifics about what [he] can read and at what distance, or whether he would need magnification or other accommodation." (ECF #11 at PageID 730-31). Mr. Utterback argues the ALJ interpreted the statement "he can read" to mean that he can read 14-point font size, occasionally perform tasks requiring near and far acuity and depth perception, and perform tasks that do not require peripheral vision in the right eye. (*Id.* at PageID 731). He

contends these specific limitations are supported only by the ALJ's interpretation of the medical data.

Contrary to Mr. Utterback's proclamation, the limitations concerning font size, near acuity, depth perception, and peripheral vision did not flow solely from Dr. Thomas's conclusion that "he can read." Rather, the ALJ drew those conclusions from the state agency medical consultants' RFC assessments. Discussed above, the consultants both opined Mr. Utterback is limited in near acuity, depth perception, accommodation, and field of vision. The ALJ determined the consultants' visual limitations were proper and supported by the evidence of record, including the eye examination findings, a finding Mr. Utterback does not challenge. (Tr. 373). Mr. Utterback takes issue with the ALJ's conclusion that he can read 14-point type size because "there is no standard correlation between a person's reading visual acuity and the specific font size they would need." (ECF #11 at PageID 731). Whether that is the case, it does not support Mr. Utterback's assertion that the ALJ "substituted his own medical judgment for that of a medical professional"; indeed, the second state agency consultant opined Mr. Utterback "should not be expected to read fine print." Moreover, limiting type size to 14-point, a type size commonly considered larger than fine print, reasonably accommodates a restriction from reading fine print. Although the ALJ may not substitute his opinion for that of a physician, he need not recite the medical opinion verbatim in his RFC findings. *Poe v. Comm'r of Soc. Sec.*, 342 F.App'x 149, 157 (6th Cir. 2009). The ALJ's conclusions about Mr. Utterback's vision-related limitations are not the product of the ALJ's interpretation of the medical data but rather are based on the state agency consultants' opinions. Therefore, Mr. Utterback has not shown the ALJ substituted his own

opinion for that of a medical professional in assessing the RFC. I recommend the District Court decline to remand on this basis.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **AFFIRM** the Commissioner's decision denying disability insurance benefits.

Dated: September 21, 2026

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

## OBJECTIONS, REVIEW, AND APPEAL

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.**

**Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health & Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-cv-186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).**